**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **HANGZHOU JINGYAO TECHNOLOGY CO., LTD.,** | Case No.: 1:26-cv-4926 |
| Plaintiff, | |
| v. | DEMAND FOR A JURY TRIAL |
| **LUSTER LEAF PRODUCTS, INC.** | |
| Defendant. | |

**COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT AND PATENT INVALIDITY**

Plaintiff Hangzhou Jingyao Technology Co., Ltd. ("Jingyao" or "Plaintiff") brings this

action against Defendant Luster Leaf Products, Inc. ("Luster Leaf" or "Defendant"), and alleges

as follows:

**NATURE OF THE ACTION**

1.      This is an action for declaratory judgment of non-infringement and patent

invalidity arising under the patent laws of the United States, 35 U.S.C. § 100 et seq., and the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

2.      Plaintiff seeks a declaratory judgment that: (a) Plaintiff's electronic soil testing

meter (ASIN: B0GFN27XZ1) (the "Jingyao Product") does not infringe any valid and

enforceable claim of U.S. Patent No. 8,938,361 B2 (the "'361 Patent"); and (b) the asserted

claims of the '361 Patent are invalid under 35 U.S.C. §§ 103, and Claim 16 is independently

invalid under and 112. A true and correct copy of U.S. Patent No. 8,938,361 B2 is attached

hereto as Exhibit A.

1

3. Plaintiff brings this action in view of the actual and ongoing controversy created by Defendant's assertion of the '361 Patent against Plaintiff. On March 1, 2026, Defendant filed a patent infringement complaint with Amazon.com against the Jingyao Product (ASIN: B0GFN27XZ1) based on the '361 Patent (Amazon complaint ID 19536759781). As a direct result, Amazon removed the Jingyao Product from its marketplace and issued Plaintiff a formal "Policy Warning" against Plaintiff's seller account. Despite Plaintiff's March 13, 2026 written demand that Defendant retract its Amazon complaint within 48 hours, Defendant has refused to withdraw its infringement allegations and has never responded in any form. The Jingyao Product remains delisted from Amazon.com, causing Plaintiff substantial and continuing irreparable harm.

4. The Jingyao Product does not infringe the '361 Patent. Its only "calibration" consists of four manual trimmer potentiometers adjusted by a factory technician with a screwdriver and then permanently fixed, passive components that are not electrically connected to the microcontroller and perform no averaging of any readings. It therefore satisfies none of the averaging-based calibration limitations added to Claims 1 and 16 during prosecution to overcome the prior art.

5. The "averaging" limitation is, moreover, the very feature the applicant added during prosecution to overcome a prior art rejection. Defendant is therefore estopped from recapturing under the doctrine of equivalents any subject matter that was surrendered—including the iterative reading, loop-based signal monitoring, per-cycle smoothing, and median filtering techniques that are actually used by the Jingyao Product.

6. The '361 Patent is also invalid. The asserted claims are obvious under 35 U.S.C. § 103 in view of prior art that, together with the knowledge of a person of ordinary skill in the art,

2

discloses or renders obvious, discloses every element of the independent claims, including the "averaging" limitation. Independently, Claim 16 is invalid under 35 U.S.C. § 112(a) for lack of written description. The 'averaging' limitation added to Claim 16 by the 2014 Amendment requires a hardware "calibration circuit" that performs averaging of initial analog readings to obtain a neutral value. The '361 Patent specification, however, describes only two mutually exclusive calibration embodiments, a floating calibration performed in software by the microcontroller without any calibration circuit (FIGS. 1–2), and a fixed calibration performed by a hardware calibration circuit comprising factory-set variable resistors that performs no averaging (FIGS. 8–11). The combination required by amended Claim 16, a hardware calibration circuit that itself performs averaging, is not described anywhere in the specification. In addition, because the 'averaging' limitation as recited in both Claim 1 and Claim 16 finds no written description support in the priority Provisional Application, the asserted claims are not entitled to the December 7, 2009 provisional priority date for that limitation, and additional prior art (including the Date reference) is available under 35 U.S.C. § 102(a) to render them obvious.

## THE PARTIES

7. Plaintiff Hangzhou Jingyao Technology Co., Ltd. is a limited liability company organized under the laws of the People's Republic of China, with its principal place of business in Hangzhou, Zhejiang Province, China. Plaintiff sells the Jingyao Product on the Amazon.com marketplace under the store name "Jingyaokejiyouxiangongsi" (Amazon Seller ID: A39QXHUTF6J3O3).

8. On information and belief, Defendant Luster Leaf Products, Inc. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business

3

at 2220 Hebron Avenue, Woodstock, Illinois 60098. Luster Leaf is the owner by assignment of the '361 Patent. See Ex. A.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. This action arises under the Patent Act, 35 U.S.C. § 100 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Federal courts have exclusive jurisdiction over patent matters under 28 U.S.C. § 1338(a).

10.      An actual case or controversy exists between the parties within the meaning of Article III of the United States Constitution and 28 U.S.C. § 2201, as interpreted by the Supreme Court in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). Defendant's assertion of the '361 Patent against Plaintiff, as alleged in ¶¶ 3 and 30–34 below, creates a substantial, immediate, and real dispute regarding the validity of the '361 Patent and whether the Jingyao Product infringes any valid claim thereof.

11.      This Court has general personal jurisdiction over Defendant because Defendant is a corporation organized under the laws of the State of Illinois with its principal place of business in Woodstock, McHenry County, Illinois, within this judicial district. See *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

12.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this judicial district. Venue is also proper under 28 U.S.C. § 1400(b), because Defendant has a regular and established place of business in this district.

**FACTUAL BACKGROUND**

*A. The '361 Patent*

4

13. The '361 Patent, entitled "Electronic Gardening Tool and Method of Configuring the Same," was filed on December 7, 2010 as U.S. Application No. 12/962,274, claiming priority to U.S. Provisional Application No. 61/267,206, filed December 7, 2009. The '361 Patent issued on January 20, 2015. The named inventors are Mark B. Williams and Larry L. Holbein. The assignee is Luster Leaf Products, Inc. *See* Ex. A.

14. The '361 Patent generally relates to an electronic device for measuring soil characteristics such as pH and moisture. The patent describes a device with a sensor circuit, an analog-to-digital converter ("ADC"), a microcontroller, and a display panel. *See* Ex. A, col. 1, ll. 34–44.

15. The '361 Patent has 21 claims. Claims 1 and 16 are independent. Claims 2 through 15 depend from Claim 1, and Claims 17 through 21 depend from Claim 16. Claim 1 is an apparatus claim in which the microcontroller is configured to perform three operationally distinct steps: (i) obtain "a plurality of initial readings" from the sensor circuit "when the apparatus is powered on"; (ii) "obtain a nominal value by averaging the initial analog readings"; and (iii) "assign a zero reference associated with a neutral value of the soil characteristic to the nominal value derived by averaging the initial readings". *See* Ex. A, col. 9, ll. 14–48 (Claim 1). Claim 16 is a structurally distinct apparatus claim requiring a dedicated "calibration circuit adapted to set a zero reference associated with a neutral value of the soil characteristic to a fixed reference voltage from the sensor circuit by averaging initial analog readings to obtain the neutral value." *See* Ex. A, col. 10, ll. 64–67, col. 11, ll. 1-10 (Claim 16). Unlike Claim 1, Claim 16 does not expressly require that the calibration readings be taken "when the apparatus is powered on," and its zero reference is set to a fixed reference voltage rather than to a separately

computed nominal value. Claim 17, dependent on Claim 16, further specifies that the calibration circuit includes a variable resistor connected between the sensor circuit and the microcontroller.

### B. The Asserted Claims Require an Averaging-Based Calibration Process

16.     The plain language of Claim 1 of the '361 Patent requires three operationally and temporally distinct steps, each of which has an ordinary and well-understood meaning. Claim 16, by contrast, does not enumerate separate operational steps. Instead, it recites a single hardware element, a "calibration circuit" with a single compound functional description. The plain language of Claim 1 is analyzed in sub-paragraphs (i) through (iii) immediately below. The plain language of Claim 16 is separately analyzed in paragraph 20.

17.     As to Claim 1: **(i)** *"obtain a plurality of initial readings from the sensor circuit when the apparatus is powered on"*. The claim uses the term "initial readings" without the modifier "analog" to refer to a specific set of sensor readings taken at the moment of power-up, not readings taken during ordinary, ongoing measurement. The readings must be "initial" (i.e., the first readings taken, for a distinct calibration purpose, distinct from the subsequent measurement sequence) and they must be taken "when the apparatus is powered on" (i.e., at power-on, not continuously throughout operation). This temporal limitation, "when the apparatus is powered on," has no counterpart in Claim 16, which imposes no power-on timing requirement on its face. The phrase "initial analog readings," however, appears in both Claim 1 and Claim 16, and the '361 Patent's specification and prosecution history use that phrase in both instances to refer to a discrete set of readings acquired at device initialization for a dedicated calibration purpose, not to the leading samples of ordinary, ongoing measurement cycles.

18.     As to Claim 1: **(ii)** *"obtain a nominal value by averaging the initial analog readings"*. "Averaging" has an ordinary mathematical meaning: computing the arithmetic mean

of a set of values. The result must be a *nominal value*, i.e., a single reference value that is thereafter used as a baseline. This is not the same as real-time smoothing or median filtering, all of which are mathematically and functionally distinct operations. As discussed in paragraph 20 below, Claim 16 also contains an "averaging" requirement, but as part of a compound hardware-functional description rather than as a discrete microcontroller step.

19.     As to Claim 1: **(iii)** *"assign a zero reference associated with a neutral value of the soil characteristic to the nominal value derived by averaging the initial readings."* This step requires the microcontroller to *store* and *use* the averaged nominal value as the device's "zero reference" for subsequent measurement of the soil characteristic. The claim language makes clear that Claim 1's "zero reference" is software-derived: it is computed by the microcontroller from initial readings and assigned to the software-computed nominal value. It is not a hardware-fixed reference established by manual trimmer potentiometers or fixed resistor dividers at the factory.

20.     As to Claim 16: Claim 16's calibration-related requirement is a single compound hardware-functional limitation: "a calibration circuit adapted to set a zero reference associated with a neutral value of the soil characteristic to a fixed reference voltage from the sensor circuit by averaging initial analog readings to obtain the neutral value." This limitation differs from Claim 1 in three structural respects that bear directly on the non-infringement analysis. First, Claim 16 requires a dedicated hardware "calibration circuit" as a distinct apparatus element, separate from the microcontroller. This is not merely a functional description of software behavior; it is a hardware circuit element whose structure and connection to other components are part of the claim. Claim 17, which depends from Claim 16, further specifies that "the calibration circuit includes a variable resistor, and the calibration circuit is connected between

7

the sensor circuit and the microcontroller." Second, the target to which the zero reference is set differs from Claim 1. In Claim 1, the zero reference is assigned to the software-computed "nominal value derived by averaging." In Claim 16, the zero reference is set to "a fixed reference voltage from the sensor circuit," a fixed voltage established through the hardware calibration circuit, with averaging serving as the mechanism to identify and obtain that neutral value. Third, unlike Claim 1, Claim 16 imposes no express "when the apparatus is powered on" temporal requirement. The calibration circuit operates to set the fixed reference voltage, but the claim does not specify when this occurs. Notwithstanding these structural differences from Claim 1, Claim 16's "by averaging initial analog readings" requirement remains a necessary element of the calibration circuit's function. A calibration circuit that does not average initial analog readings, whether because it is a passive hardware element or for any other reason, does not satisfy Claim 16. As detailed in Chart 2 below, the Jingyao Product satisfies none of the critical limitations of Claim 16: it has no calibration circuit connected between the sensor circuit and the microcontroller, it generates no fixed reference voltage through any such circuit, and it performs no averaging of initial analog readings at any time.

21.     The prosecution history confirms these meanings. The applicant repeatedly argued that prior art reference Bjornsson did not disclose this specific averaging-based calibration process, and the Examiner allowed the claims only after Claim 1 was amended to add an explicit averaging step and Claim 16 was amended to add an averaging requirement to its calibration circuit limitation. See § C below.

### C. Prosecution History of the '361 Patent

22.     Although original Claim 1 as filed on December 7, 2010 already recited assignment of a zero reference "to a nominal value derived by averaging the initial readings," Ex.

B at 3 (Office Action quotation of original Claim 1), the corresponding "by averaging initial analog readings" limitation in Claim 16 was not present in the originally-filed Claim 20. It was added to Claim 20 by amendment during prosecution to overcome a prior-art rejection, as set forth below. The 2014 Amendment also added an explicit second "averaging" step to Claim 1 ("obtain a nominal value by averaging the initial analog readings"), changing the parsing of Claim 1's averaging requirement but not its underlying concept. A true and correct copy of the relevant prosecution history, including the Office Action dated March 25, 2014 and the applicant's June 25, 2014 Amendment and Remarks (the "2014 Amendment"), is attached hereto as Exhibit B.

23.     In the Office Action dated March 25, 2014, the USPTO rejected original Claims 1–15, 20, and 22–25 under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 5,621,669 to Bjornsson ("Bjornsson"), and rejected original Claim 21 under 35 U.S.C. § 103(a) as unpatentable over Bjornsson. *See* Ex. B at 8.

24.     In the 2014 Amendment, the applicant amended independent Claim 1 by (i) adding the explicit step "obtain a nominal value by averaging the initial analog readings; and," and (ii) changing the existing assignment step to specify that the zero reference is assigned to "the nominal value derived by averaging the initial readings" (replacing "a nominal value derived by averaging the initial readings"). Ex. B at 2 (showing strikethrough and underline markings of the amendment).

25.     The applicant similarly amended independent Claim 20 (which later issued as Claim 16) to add the phrase "by averaging initial analog readings to obtain the neutral value" to the existing  calibration circuit limitation, so that the amended claim now required "a calibration circuit adapted to set a zero reference associated with a neutral value of the soil characteristic to

9

a fixed reference voltage from the sensor circuit *by averaging initial analog readings to obtain the neutral value.*" Ex. B at 6.

26. The applicant then argued to the Examiner that Bjornsson did not disclose averaging. Specifically, the applicant stated: *"At best, Bjornsson discloses a reset sequence and a measurement sequence for a sensor probe. ... In the measurement sequence, a 'program loop iteratively reads the level of input signal 462 from comparator 312.' ... Bjornsson discloses that '[d]uring each iteration of the loop, the value of register RR4 is incremented' and the 'loop terminates when the current input value from signal 462 differs from the initial value.'"* Ex. B at 8–9 (quoting Bjornsson at 16:30–20:20).

27. The applicant contrasted this iterative loop mechanism with the claimed averaging step: *"There is no disclosure in Bjornsson of obtaining a nominal value by averaging the initial analog readings, and assigning a zero reference associated with a neutral value of the soil characteristic to a nominal value derived by the average of the initial readings, as required by claim 1."* Ex. B at 9. The applicant then concluded: *"For at least this reason, Bjornsson fails to anticipate claim 1. Accordingly claim 1 is allowable over Bjornsson."* Id.

28. With respect to amended Claim 20 (issued as Claim 16), the applicant likewise argued that *"Bjornsson ... fails to disclose an apparatus for measuring a soil characteristic having a calibration circuit adapted to set a zero reference associated with a neutral value of the soil characteristic to a fixed reference voltage from the sensor circuit by averaging initial analog readings to obtain the neutral value, as required by amended claim 20."* Ex. B at 10. The applicant argued this was an independent reason that Bjornsson did not anticipate Claim 20.

29. Based on these arguments, the Examiner withdrew the rejections and allowed the claims. The prosecution history thus establishes that "averaging" initial analog readings is the

key claim limitation that distinguishes the '361 Patent from the prior art. Iterative reading, loop-based signal monitoring, reset-and-measurement sequences, and any other method of establishing a reference value that does not involve averaging of initial analog readings were surrendered during prosecution.

**D. Defendant's Patent Assertion Against Plaintiff and Plaintiff's Unsuccessful Efforts to Obtain Relief**

30. On March 1, 2026, Defendant filed a patent infringement complaint with Amazon.com against the Jingyao Product (ASIN: B0GFN27XZ1). On the same date (March 1, 2026, at 14:54:10), Amazon sent Plaintiff a formal "Policy Warning" notice, stating that Amazon had "removed the following listing" as a result of Defendant's complaint, identifying Defendant Luster Leaf Products, Inc. as the complainant, listing *cholbein@lusterleaf.com* as the complainant's contact email, and warning Plaintiff that further complaints could result in suspension of Plaintiff's Amazon seller account. A true and correct copy of the March 1, 2026 Amazon Policy Warning notice is attached hereto as Exhibit C.

31. On or about March 13, 2026, Plaintiff (through the store account "Jingyaokejiyouxiangongsi") sent a written retraction demand directly to Defendant at the email address cholbein@lusterleaf.com. The demand notified Defendant that Defendant's Amazon complaint "lacked factual basis and was a malicious reporting act," requested that Defendant withdraw the Amazon complaint within 48 hours (i.e., by March 15, 2026) and confirm the withdrawal in writing, and placed Defendant on notice that, absent timely withdrawal, Plaintiff would "protect our rights and interests through legal means, including but not limited to filing a lawsuit in court."

32. The 48-hour deadline set forth in Plaintiff's March 13, 2026 demand expired on March 15, 2026. Defendant never responded to Plaintiff's demand in any form. As of the filing

11

of this Complaint, Defendant has not withdrawn its Amazon infringement complaint, has not agreed to withdraw its complaint, and has not communicated with Plaintiff in any manner concerning Plaintiff's demand.

33. Defendant has therefore been placed on notice, through Plaintiff's March 13, 2026 written demand, of Plaintiff's position that the Jingyao Product does not practice the "averaging" calibration method claimed in the '361 Patent. Despite that notice and Plaintiff's direct written demand, Defendant has continued to assert the '361 Patent against the Jingyao Product, has refused to retract its Amazon complaint, and has not responded to Plaintiff's demand at all.

34. The Jingyao Product is a significant product for Plaintiff's U.S. business. Its delisting from Amazon.com has continued since March 1, 2026, and it continues to this day. The delisting has caused, and continues to cause, Plaintiff substantial and irreparable harm, including lost revenue, loss of product-page ranking and search-algorithm visibility, loss of accumulated consumer reviews and ratings, loss of goodwill, disruption of supplier and logistics relationships, threatened suspension of Plaintiff's Amazon seller account (as expressly warned by Amazon in the March 1, 2026 Policy Warning notice), and damage to Plaintiff's broader U.S. market position. These harms are ongoing and compounding each day the product remains delisted, and they cannot be fully remedied by money damages alone. Plaintiff has exhausted Amazon's internal appeal process. Absent the declaratory relief sought in this action, Plaintiff has no adequate remedy.

### E. The Jingyao Product Does Not Infringe Any Claim of the '361 Patent

35. Patent infringement requires that an accused product contain each and every limitation of an asserted claim, either literally or under the doctrine of equivalents. The Jingyao

Product does not satisfy the "averaging" and related limitations of Claim 1, nor the "calibration circuit," "fixed reference voltage," and "averaging" limitations of Claim 16, either literally or under the doctrine of equivalents. Because each asserted claim requires each of those limitations, the Jingyao Product cannot infringe any claim of the '361 Patent.

36. The Jingyao Product is a multi-function electronic soil tester that measures soil pH, moisture, temperature, and light levels. The product uses a Holtek HT46R47/HT46C47 microcontroller (18-pin SOP package) with a 9-bit on-chip ADC (512-level resolution), and an HT1621 LCD driver that drives a segment LCD. The microcontroller firmware is written in C; the relevant source file for the firmware is "GHK_8V11.c." *See* Declaration of Long Huang ("Huang Decl.") ¶¶ 3, 13, 15, filed concurrently herewith. The following chart demonstrates, on an element-by-element basis, that the Jingyao Product does not meet multiple limitations of Claim 1 of the '361 Patent:

| Claim Limitation | Jingyao Product (ASIN: B0GFN27XZ1) |
|---|---|
| *[1.preamble] An apparatus for measuring a soil characteristic, comprising:* | The Jingyao Product is an electronic soil meter that measures soil pH, moisture, temperature, and light levels. Not disputed for purposes of this element. |
| *[1.a] a sensor circuit adapted to output an analog signal reflecting a measure of the soil characteristic;* | The Jingyao Product contains a passive sensor circuit (probe tip/tube with signal conditioning using TLC272C op-amp and LM324DG). Not disputed for purposes of this element. |
| *[1.b] an analog-to-digital converter adapted to convert the analog signal to a digital value;* | The Jingyao Product uses the 9-bit (512-level) on-chip ADC of the Holtek HT46R47/HT46C47 microcontroller. Not disputed for purposes of this element. *See* Huang Decl. ¶ 13. |
| *[1.c] a microcontroller receiving and processing the digital value; and* | The Jingyao Product uses a Holtek HT46R47/HT46C47 microcontroller in an 18-pin SOP package. Not disputed for |

| Claim Limitation | Jingyao Product (ASIN: B0GFN27XZ1) |
|---|---|
| | purposes of this element. |
| *[1.d] a display panel for displaying the measure of the soil characteristic;* | The Jingyao Product uses a segment LCD driven by a Holtek HT1621 LCD driver IC. Not disputed for purposes of this element. |
| ***[1.e] wherein the microcontroller is configured to: obtain a plurality of initial readings from the sensor circuit when the apparatus is powered on;*** | **NOT MET.** Upon power-on, the Jingyao firmware initializes ports, timers, the LCD, and state variables. It does not then acquire a dedicated set of "initial readings" for the purpose of establishing a reference. Instead, the firmware enters its main operating loop and begins ordinary periodic ADC measurements every 500 milliseconds (gated by the timer 500-ms counter t500mcnt). There is no power-on calibration step, no initial-reading averaging, and no zero-reference computation at any point in the boot sequence. *See* Huang Decl. ¶ 17. |
| ***[1.f] obtain a nominal value by averaging the initial analog readings; and*** | **NOT MET.** The Jingyao firmware never computes a "nominal value" by averaging initial readings. For all four channels (pH, moisture, temperature, and light), the firmware applies the same three-sample median filter: it takes three consecutive ADC readings per channel (stored in a three-element buffer adc_arr[0..2]) and selects the middle of the three values, rather than computing any arithmetic mean. This per-cycle median selection is a real-time outlier-rejection technique applied continuously during ordinary measurement, not a one-time power-on averaging of initial readings to establish any baseline. *See* Huang Decl. ¶ 19. No variable storing a "nominal value" ever exists in the firmware. |
| ***[1.g] assign a zero reference associated with a neutral value of the soil characteristic to the nominal value derived by averaging the initial readings.*** | **NOT MET.** The Jingyao firmware never assigns a "zero reference" or stores any "neutral value." Raw ADC values are converted to display values through fixed hardcoded lookup tables |

| Claim Limitation | Jingyao Product (ASIN: B0GFN27XZ1) |
|---|---|
|  | (ph_adc_value[14], temp_adc_table[102], humi_adc_value[4], light_adc_value[5]). Any hardware "zero" adjustment is performed exclusively by manual trimmer potentiometers (VR1–VR4) set at the factory by a technician with a screwdriver. These are passive, non-programmable, fixed-resistance components that the firmware does not read, write, or adjust. *See* Huang Decl. ¶¶ 11, 13. |

*Chart 1*

The following chart demonstrates that the Jingyao Product does not meet the critical

"calibration circuit" limitation of Claims 16 and 17 of the '361 Patent:

| Claim Limitation | Jingyao Product (ASIN: B0GFN27XZ1) |
|---|---|
| *[16.preamble] An apparatus for measuring a soil characteristic, comprising:* | Not disputed for purposes of this element. |
| *[16.a] a sensor circuit adapted to output an analog signal reflecting a measure of the soil characteristic;* | Not disputed for purposes of this element. |
| *[16.b] a microcontroller coupled with the sensor circuit, wherein the microcontroller includes an analog-to-digital converter adapted to convert the analog signal to a digital value;* | Not disputed for purposes of this element. |
| *[16.c] a display panel for displaying the measure of the soil characteristic; and* | Not disputed for purposes of this element. |
| ***[16.d] a calibration circuit adapted to set a zero reference associated with a neutral value of the soil characteristic to a fixed reference voltage from the sensor circuit by averaging initial analog readings to obtain the neutral value.*** | **NOT MET.** The Jingyao Product does not satisfy this limitation for three independent reasons, any one of which is alone sufficient. First, no calibration circuit is connected to the microcontroller. The only components in the Jingyao Product that affect calibration are four passive trimmer potentiometers (VR1–VR4) soldered onto the printed circuit board. These potentiometers are adjusted once at the factory by a technician using a screwdriver |

15

| Claim Limitation | Jingyao Product (ASIN: B0GFN27XZ1) |
|---|---|
| | and are thereafter mechanically fixed. They are passive, fixed-resistance components: they carry no digital control signals, they receive no commands from, and transmit no data to, the microcontroller. They are not "adapted to" perform any function in the sense that Claim 16 uses that term—i.e., they are not programmed or electronically configured to perform any of the operations the claim describes. They are therefore not a "calibration circuit" within the meaning of Claim 16. Second, there is no "fixed reference voltage from the sensor circuit." Claim 16 requires the calibration circuit to set the zero reference to "a fixed reference voltage from the sensor circuit." In the Jingyao Product, the sensor circuit outputs an analog signal that is biased and conditioned by the passive potentiometer network before reaching the microcontroller's ADC input. No component generates, stores, or designates a discrete "fixed reference voltage" to which any zero reference is set. The ADC uses its own internal reference voltage; the sensor circuit does not output a separate fixed reference voltage for calibration purposes. This element is absent from the Jingyao Product. Third, there is no "averaging initial analog readings." The Jingyao Product's firmware performs no averaging of initial analog readings to obtain any neutral value or zero reference at any time—at power-on or otherwise. As detailed in paragraphs 37–39 below: (a) upon power-on, the firmware executes only a hardware initialization routine and then enters its main measurement loop, beginning ordinary periodic ADC sampling every 500 milliseconds; and (b) for all four channels (pH, moisture, temperature, and light), the firmware applies a three-sample median filter that selects the middle of three consecutive ADC readings rather than computing any arithmetic mean. None of |

16

| Claim Limitation | Jingyao Product (ASIN: B0GFN27XZ1) |
|---|---|
| | these techniques constitutes "averaging initial analog readings to obtain [a] neutral value" as required by Claim 16. *See* Huang Decl. ¶¶ 11, 13, 17–19. |
| *[17] (Dependent on Claim 16) the calibration circuit includes a variable resistor, and the calibration circuit is connected between the sensor circuit and the microcontroller.* | **NOT MET.** Although the Jingyao Product uses trimmer potentiometers (VR1–VR4), which are a species of variable resistor, the Jingyao Product does not satisfy Claim 17 for two independent reasons. First, Claim 17 is a dependent claim that incorporates all limitations of Claim 16, including the requirement that the calibration circuit set a zero reference "by averaging initial analog readings to obtain the neutral value." As established above, the Jingyao Product's potentiometers perform no averaging of any readings. A variable resistor that does not participate in any averaging-based calibration process is not a "variable resistor" within the meaning of Claim 17's "calibration circuit"—because it cannot be part of a "calibration circuit" that satisfies Claim 16. Since the predicate limitations of Claim 16 are not met, Claim 17 cannot be infringed regardless of whether a variable resistor is present. *See* Huang Decl. ¶¶ 11, 13. Second, Claim 17 depends from Claim 16 and therefore requires that the component at issue be a "calibration circuit" within Claim 16's meaning—i.e., a circuit that participates in establishing the zero reference by averaging initial analog readings. VR1–VR4 perform no averaging and establish no zero reference; they are passive, fixed-resistance elements permanently set at the factory and not electrically connected to any input or output port of the microcontroller. Their mere physical placement in the analog signal path does not make them a "calibration circuit connected between the sensor circuit and the microcontroller" under Claim 17. |

*Chart 2*

17

37. **Calibration method.** The Jingyao Product does not establish any "nominal value" or "zero reference" through software at any time, whether at power-on or otherwise. Factory calibration is performed exclusively through four manual trimmer potentiometers (VR1, VR2, VR3, VR4) on the printed circuit board. A technician at the factory adjusts each potentiometer with a screwdriver so that the device reads an expected reference value for each channel. These potentiometers are passive, fixed-resistance components once set; they are not electrically connected to, controlled by, or readable by the microcontroller; they do not receive any "analog readings"; and they do not perform any "averaging." This is fundamentally different from the automatic, software-driven or microcontroller-coupled calibration circuit claimed in the '361 Patent. *See* Huang Decl. ¶¶ 9–11, 13–14. For the reasons set forth in Chart 2 above, the Jingyao Product's factory-set potentiometers (VR1–VR4) do not satisfy the "calibration circuit" limitation of Claim 16, the "variable resistor" limitation of Claim 17, or the "fixed reference voltage" requirement, because they perform no averaging of initial analog readings, establish no zero reference, and are not electrically connected to any input or output of the microcontroller.

38. **Factory Calibration Work Instruction pre-dating the '361 Patent.** Plaintiff's VR1-VR4 manual-potentiometer factory-calibration methodology is not a litigation-driven design, nor a design adopted in response to the '361 Patent. Plaintiff has used that same methodology on its production line since at least December 23, 2006, nearly three years before the December 7, 2009 provisional priority date of the '361 Patent. Plaintiff's factory Calibration Work Instruction (Document No. SC01, Version 01, dated 2006.12.23), which is issued to and followed by production-line operators, expressly instructs the operator, at step 3 of the "calibration method": (a) to adjust trimmer potentiometer VR3 "until pH reads 7.0;" (b) to adjust trimmer potentiometer VR1 "until NOR indicator appears;" and (c) to adjust trimmer

potentiometers VR4 and VR2 against a reference lamp so that the photoresistor correctly cycles through the LOW, LOW+, NOR_, NOR, NOR+, HGH_, HGH, and HGH+ display modes. The tools expressly listed in the work instruction are a *9-volt battery and reference lamp*, a *Phillips screwdriver*, and a *5.2 kΩ resistor with temperature wire*, all manual hardware tools; no software averaging routine, no microcontroller-coupled calibration circuit, and no "initial analog readings" averaging step is used or referenced. A true and correct copy of the Calibration Work Instruction (SC01 v01, dated December 23, 2006) is attached hereto as Exhibit D. The work instruction is contemporaneous documentary evidence that the VR1–VR4 manual factory-calibration method described in the chart above and in the preceding paragraph has been Plaintiff's actual production-line practice since at least December 2006, long before the '361 Patent's priority date. *See* Huang Decl. ¶¶ 7–8.

39.     **Display conversion.** Raw ADC values from each channel are converted to displayed physical measurements (pH, temperature, moisture, light) through fixed hardcoded lookup tables in the firmware (ph_adc_value[14], temp_adc_table[102], humi_adc_value[4], light_adc_value[5]). At no point does the firmware compute a "nominal value" from initial readings, nor does it shift or bias any measurement by a software-derived "zero reference." *See* Huang Decl. ¶¶ 17–18.

### F. Prosecution History Estoppel Bars Any Doctrine-of-Equivalents Theory

40.     The doctrine of equivalents cannot be used to recapture claim scope that the patentee surrendered during prosecution to obtain the patent. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002). A narrowing amendment made to secure allowance of the claim in response to a prior-art rejection gives rise to a presumption of surrender of the territory between the original claim and the amended claim.

19

41.     The 2014 Amendment was a narrowing amendment made for reasons of patentability: it was made to overcome a § 102(b) rejection based on Bjornsson. The applicant added the averaging-based calibration limitations precisely to distinguish Bjornsson's iterative reading technique. *See* Ex. B at 2, 6, 8–10. The presumption of surrender under *Festo* therefore applies.

42.     The territory surrendered by the 2014 Amendment includes, at minimum: (i) calibration approaches that do not involve averaging of initial analog readings; (ii) iterative reading techniques (such as Bjornsson's program loop that incrementally reads a signal and increments a register until a termination condition is met); (iii) reset-and-measurement sequences that set registers to initialization values rather than computing an average; and (iv) any other method of establishing a reference value that selects among samples rather than averaging them.

43.     Each of the non-averaging techniques used by the Jingyao Product, including per-cycle smoothing, median filtering, and passive manual-potentiometer factory calibration as detailed above, falls squarely within the territory surrendered by the 2014 Amendment. Any argument that Jingyao's passive potentiometers are equivalent to the "calibration circuit" of Claim 16 or the "variable resistor" of Claim 17 is independently barred, because the applicant added the averaging-based calibration limitation to Claim 16 specifically to overcome Bjornsson, thereby surrendering all calibration approaches, whether hardware or software, that do not involve averaging of initial analog readings. Accordingly, no claim of the '361 Patent can reach the Jingyao Product under the doctrine of equivalents.

### G. Invalidity of the '361 Patent

### 1. Invalidity Under 35 U.S.C. § 103 (Obviousness).

44. The asserted claims of the '361 Patent are invalid under pre-AIA 35 U.S.C. § 103 as obvious in view of the prior art. In particular, the combination of (i) U.S. Patent No. 5,621,669 to Bjornsson ("Bjornsson", A true and correct copy of U.S. Patent No. 5,621,669 is attached hereto as Exhibit E), (ii) U.S. Patent No. 7,571,075 to Glenn et al. ("Glenn", A true and correct copy of U.S. Patent No. 7,571,075 is attached hereto as Exhibit F) and, under the circumstances described below, (iii) PCT International Publication No. WO2010073682 and its corresponding U.S. Patent No. 8,707,753 to Date et al. (collectively, "Date". A true and correct copy of PCT International Publication No. WO2010073682 is attached hereto as Exhibit G. A true and correct copy of U.S. Patent No. 8,707,753 to Wataru Date et al. is attached hereto as Exhibit H) renders the asserted claims obvious, alone or in combination with additional prior art that may be identified through discovery.

45. Bjornsson issued on April 15, 1997, more than one year before the '361 Patent's December 7, 2009 priority date, and is therefore prior art under pre-AIA 35 U.S.C. § 102(b). Bjornsson discloses an electronic soil tester with a sensor circuit, ADC, microcontroller, and calibration and reference-value features. Bjornsson was the primary reference cited by the Examiner during prosecution and was admitted by the applicant to disclose the device architecture and a reset-and-measurement-sequence reference procedure. See Ex. B at 8–9; Ex. E, col. 16, ll. 30–col. 20, ll. 20. Bjornsson thus provides the complete device architecture recited in the preambles and basic sensor, ADC, microcontroller, and reference-value calibration procedure elements of Claims 1 and 16. Glenn supplies the consumer-grade display panel and soil pH/moisture meter product framework.

46. Glenn was filed on February 28, 2007 and issued on August 4, 2009. Because Glenn was filed by inventors other than the named inventors of the '361 Patent and was filed

21

before the December 7, 2009 provisional priority date of the '361 Patent, Glenn qualifies as prior art under 35 U.S.C. § 102(b). Glenn discloses an electronic plant-sensing device that measures soil moisture and soil pH, converts analog probe readings to digital values through an ADC, processes the digital values in a microcontroller, and displays soil information. Glenn further discloses the use of a plant database and species-specific target values. Glenn thus discloses the overall framework of a consumer-grade digital soil pH/moisture meter with plant-specific programmability, and further discloses reading sensor values on device startup.

47. To the extent the '361 Patent is found to lack adequate written description support in the Provisional Application for the "averaging" limitation, as set forth in Section G (2) below, the effective priority date for that limitation is no earlier than the non-provisional filing date of December 7, 2010. In that event, PCT International Publication No. WO2010073682 (International Application No. PCT/JP2009/007220, filed December 25, 2009, published July 1, 2010) (Ex. G), and its corresponding U.S. Patent No. 8,707,753 to Wataru Date et al. ("Date", Ex. H), constitute prior art under pre-AIA 35 U.S.C. § 102(a) with respect to the "averaging" limitation, because the PCT publication was made publicly available on July 1, 2010, more than five months before the non-provisional filing date of December 7, 2010. Date discloses an electronic measurement apparatus that, upon initialization under an idle or no-load condition, acquires a plurality of initial output values from the sensor, awaits stability of those values, computes the arithmetic mean of the stable initial values, and stores the averaged result as a "0 kg reference value," a zero reference established by averaging initial readings, that is thereafter used as the baseline for all subsequent measurements. Date thus discloses the precise algorithmic technique of averaging a plurality of initial sensor readings to establish a zero-point neutral reference value. This is the same technique the '361 Patent applicant added by amendment to

22

distinguish Bjornsson. To the extent Date qualifies as prior art under § 102(a), the combination of Bjornsson, Glenn, and Date renders Claims 1 and 16 obvious: Bjornsson provides the sensor/ADC/microcontroller architecture and reference-value calibration concept; Glenn provides the consumer-grade soil pH/moisture meter product framework; and Date provides direct prior art evidence that averaging initial sensor readings to establish a zero reference was a known and implemented technique in digital measurement devices prior to the '361 Patent's effective filing date.

48. A person of ordinary skill in the art at the time of the '361 Patent's December 7, 2009 priority date would have found it obvious to combine Bjornsson's soil-tester architecture and reset/reference procedure with Glenn's consumer soil pH/moisture meter framework. The motivation to combine is strong and straightforward: Bjornsson and Glenn are in the identical field of digital soil measurement and both address the common problem of establishing a reliable baseline reference for a sensor-based device. The specific technique of averaging a plurality of initial readings to reduce measurement noise and obtain a stable reference value is one of the most elementary and well-known methods in digital signal processing, universally familiar to any firmware engineer working with noisy ADC readings well before December 2009. A person of ordinary skill in the art, familiar with Bjornsson's reference-value procedure and Glenn's consumer soil-tester architecture, would immediately recognize that replacing Bjornsson's iterative reading loop with a simple arithmetic average of initial readings is a routine design choice requiring no more than ordinary skill.

49. Secondary considerations of non-obviousness do not rescue the claims. Averaging noisy sensor readings to reduce measurement error is a technique in common use since at least the 1970s; the combination of digital soil measurement with averaged power-on calibration is not

the kind of non-obvious leap that supports patentability. There is no evidence of commercial success tied to the claimed averaging feature (as distinguished from the overall digital-soil-meter concept, which Glenn and Bjornsson already disclosed), and no evidence of long-felt need or failure of others specifically with respect to power-on averaging calibration.

***2. The Provisional Application Does Not Support the "Averaging" Limitation, Causing the Asserted Claims to Lose the Provisional Priority Date for that Limitation; Claim 16 Is Independently Invalid Under 35 U.S.C. § 112(a).***

50. The '361 Patent claims priority to U.S. Provisional Application No. 61/267,206, filed December 7, 2009 (the "Provisional Application"). A true and correct copy of the Provisional Application is attached hereto as Exhibit I. The Provisional Application does not describe averaging a plurality of initial analog readings to obtain a neutral value for use as a zero reference. As a result, the asserted claims of the '361 Patent are not entitled to the December 7, 2009 provisional priority date for the "averaging" limitation, and the effective filing date for that limitation is no earlier than the December 7, 2010 non-provisional filing date. The lost priority date is what allows the Date reference to qualify as prior art under pre-AIA 35 U.S.C. § 102(a), as set forth in Section G(1) above. Claim 16 is also independently invalid under 35 U.S.C. § 112(a) because the '361 Patent specification itself does not describe the combination required by amended Claim 16, which is a hardware "calibration circuit" that performs averaging of initial analog readings, as further set forth below.

51. The Provisional Application describes the self-calibration feature of the device as follows: *"The pH unit is designed to have a self calibration feature. ... When the pH meter is switched on, the electronics presumes that the probe is not in soil and does a very fast series of reads to set the neutral value from which the soil readings can be compared, and thus truer*

24

*displayed numbers can be displayed."* Ex. I at 5. The Provisional Application does not describe *averaging* these "reads." The words "average" and "averaging" do not appear anywhere in the Provisional Application's description of the self-calibration feature.

52. In a separate and distinct section titled "Stable Readings," the Provisional Application describes a different feature, display smoothing during ongoing operation, using a *"weighted average formula"*. The Provisional states: *"To avoid a screen display that might show these constant small fluctuations ..., a weighted average formula is implemented in the programming. The probes are read extremely often ... and many reading are made and then averaged with the previous display value to prevent a sudden high or low reading from quickly changing the display number."* Ex. I at 5.

53. The Provisional Application therefore expressly draws a distinction between (a) the self-calibration process at power-on, which uses "a very fast series of reads" with no averaging, and (b) the separate display-stabilization process during ongoing measurement, which uses a "weighted average formula" averaged against the "previous display value." Neither of these disclosures describes the limitation actually claimed: averaging a plurality of initial analog readings taken at power-on to obtain a "nominal value" that is then assigned as the "zero reference" or "neutral value."

54. The Provisional Application also describes the hardware side of calibration in terms consistent with manual factory trim: "The circuit in the device shown herein uses a combination of variable resistors and capacitors that are set at the factory to match the specific A to D reader of the micro-chip to the tolerance range of any given pH probe." Ex. I at 6. This further confirms that the inventors, as of the priority date, contemplated a factory-set hardware calibration—not the software-implemented averaging-based calibration later claimed.

25

55.     A person of ordinary skill in the art, reading the Provisional Application in December 2009, would not have understood the inventors to have possession of the averaging-based calibration invention claimed in Claims 1 and 16 of the '361 Patent. The Provisional therefore fails to provide adequate written description support for the "averaging" limitation.

56.     Because the Provisional Application does not provide written description support for the "averaging" limitation, the asserted claims of the '361 Patent are not entitled to the December 7, 2009 provisional priority date for that limitation under 35 U.S.C. § 119(e). The effective filing date for that limitation is no earlier than the December 7, 2010 non-provisional filing date, with the consequence (as set forth in Section G(1) above) that the Date reference qualifies as prior art under pre-AIA 35 U.S.C. § 102(a) and renders the asserted claims obvious in combination with Bjornsson and Glenn.

57.     Claim 16 of the '361 Patent is independently invalid under 35 U.S.C. § 112(a) for lack of written description. The '361 Patent specification describes only two distinct calibration embodiments, and treats them as mutually exclusive design choices. First, the "floating calibration" embodiment depicted in FIGS. 1 and 2 is a software-only embodiment in which the microcontroller itself performs averaging: "[w]hen the electronic gardening tool 100 is switched on, the microcontroller 110 can perform step 202, whereby the microcontroller 110 can obtain a plurality of initial analog readings from the sensor circuit 104. ... In step 204, the microcontroller 110 can average these initial analog readings to derive a nominal value. In step 206, the microcontroller 110 can then assign a 'zero' reference associated with a neutral value of the soil characteristic to the nominal value." Ex. A, col. 4, ll. 36–54. The specification expressly states that this floating-calibration approach has no calibration circuit at all: "the use of a floating

26

calibration method can save the extra cost of assembling a calibration circuit, so that no calibration is required at the factory." Id. col. 7, ll. 36–39.

58. Second, the "fixed calibration" embodiment depicted in FIGS. 8–11 is a hardware-only embodiment in which calibration is performed by a "calibration circuit 824" (or "924") connected between the sensor circuit and the microcontroller, comprising "a variable resistor VR1" (FIG. 10) or "a variable resistor R7" (FIG. 11) that is "adjusted at the factory to associate the zero reference of the measured soil characteristic … with a fixed sensor output voltage close to the virtual ground." Id. col. 8, ll. 14–21, 47–60. The specification explains that this fixed-calibration approach requires "less computation … at the microcontroller" than the floating-calibration approach. Id. col. 8, ll. 22–24. Nothing in the specification's description of the calibration circuit (FIGS. 8–11; col. 7, l. 56 to col. 8, l. 24, and col. 8, ll. 39–67) describes the calibration circuit as performing any averaging of any readings.

59. Amended Claim 16 requires a combination that neither embodiment supports: a hardware "calibration circuit adapted to set a zero reference … to a fixed reference voltage from the sensor circuit by averaging initial analog readings to obtain the neutral value." Ex. A, col. 10, ll. 64–67, col. 11, ll. 1–10 (Claim 16); Ex. B at 6 (showing this "by averaging initial analog readings" language was added to Claim 20 by the 2014 Amendment). The specification describes (i) microcontroller-software averaging without any calibration circuit, and (ii) a hardware calibration circuit without any averaging—but never a calibration circuit that itself performs averaging of initial analog readings. A person of ordinary skill in the art reading the '361 Patent specification would not have understood the inventors to have possessed the specific combination required by amended Claim 16. Claim 16 therefore lacks adequate written description support and is invalid under 35 U.S.C. § 112(a). See Ariad Pharms., Inc. v. Eli Lilly

27

& Co., 598 F.3d 1336, 1351–52 (Fed. Cir. 2010) (the specification must "show that the inventor actually invented the invention claimed"); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378–79 (Fed. Cir. 2009) (claims invalid where specification did not describe the specific claimed combination).

60.     Plaintiff reserves the right to assert additional grounds of invalidity and non-infringement as may be identified through discovery and further investigation, including without limitation additional prior art under 35 U.S.C. §§ 102 and 103.

## COUNT I
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT
### (35 U.S.C. § 271 and 28 U.S.C. §§ 2201–2202)

61.     Plaintiff repeats and realleges paragraphs 1 through 60 as though fully set forth herein.

62.     For the reasons set forth in ¶¶ 3, 10, and 30–34, an actual case or controversy of sufficient immediacy and reality exists between the parties concerning whether the Jingyao Product infringes any valid and enforceable claim of the '361 Patent.

63.     As set forth in detail above, the Jingyao Product does not contain each and every limitation of Claim 1 or Claim 16 of the '361 Patent, and therefore does not literally infringe any claim of the '361 Patent, including the dependent Claim 17. Prosecution history estoppel further bars Defendant from reaching the Jingyao Product's per-cycle smoothing, median filtering, iterative-reading, and passive manual-potentiometer techniques under the doctrine of equivalents.

64.     Plaintiff is entitled to a declaratory judgment that the Jingyao Product has not infringed and does not infringe any claim of the '361 Patent, either literally or under the doctrine of equivalents.

## COUNT II
## DECLARATORY JUDGMENT OF PATENT INVALIDITY

**(35 U.S.C. §§ 103 and 112; 28 U.S.C. §§ 2201–2202)**

65.     Plaintiff repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

66.     An actual and justiciable controversy exists between Plaintiff and Defendant concerning the validity of the '361 Patent. Although a patent is presumed valid under 35 U.S.C. § 282(a), that presumption may be overcome by clear and convincing evidence, which Plaintiff is prepared to present.

67.     As set forth above, (i) the asserted claims (Claims 1 and 16) of the '361 Patent are invalid under 35 U.S.C. § 103 as obvious over the combination of Bjornsson, Glenn, and Date (alone or in combination with other prior art that may be identified through discovery), the Date reference qualifying as prior art under pre-AIA 35 U.S.C. § 102(a) because the asserted claims are not entitled to the December 7, 2009 provisional priority date for the "averaging" limitation; and (ii) Claim 16 is independently invalid under 35 U.S.C. § 112(a) because the '361 Patent specification does not provide written description support for the combination required by amended Claim 16, namely a hardware "calibration circuit" that itself performs averaging of initial analog readings.

68.     Plaintiff is entitled to a declaratory judgment that the asserted claims of the '361 Patent are invalid under 35 U.S.C. §§ 103, and Claim 16 is independently invalid under 35 U.S.C. § 112.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant as follows:

29

A.　　A declaration that the Jingyao Product (ASIN: B0GFN27XZ1) does not infringe and has not infringed any valid and enforceable claim of United States Patent No. 8,938,361 B2, either literally or under the doctrine of equivalents;

B.　　A declaration that (i) Claims 1 and 16 of United States Patent No. 8,938,361 B2 are invalid under 35 U.S.C. § 103, and (ii) Claim 16 of United States Patent No. 8,938,361 B2 is independently invalid under 35 U.S.C. § 112(a);

C.　　A permanent injunction ordering Defendant and all those acting in concert with it to refrain from asserting or threatening to assert the '361 Patent against Plaintiff or its customers, resellers, distributors, suppliers, or manufacturers with respect to the Jingyao Product;

D.　　An order requiring Defendant to immediately and unconditionally withdraw the March 1, 2026 patent infringement complaint filed with Amazon.com against the Jingyao Product (ASIN: B0GFN27XZ1) (Amazon complaint ID 19536759781), and an order requiring Defendant to take all steps reasonably necessary to effectuate the full reinstatement of Plaintiff's product listing on Amazon.com, including by providing a formal written retraction to Amazon.com;

E.　　A finding that this case is exceptional under 35 U.S.C. § 285 and an award of Plaintiff's reasonable attorneys' fees and costs;

F.　　An award of Plaintiff's costs of suit; and

G.　　Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

30

Dated: April 29, 2026

Respectfully Submitted,

/s/Roumin Xie
Roumin Xie TX Bar# 24146927
Mingbo Ye TX Bar# 24124835
Veritas Light Law Group, P.C.
4340 Von Karman Ave, Suite 290,
Newport Beach, CA 92660
832-462-0087
mingboye@veritaslightlaw.com
rouminxie@veritaslightlaw.com

*Counsel for Plaintiff Hangzhou*
*Jingyao Technology Co., Ltd.*

31